## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DAVID B. SHAEV PROFIT SHARING ACCOUNT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SNYDER'S-LANCE, INC., JEFFREY A. ATKINS, PETER P. BRUBAKER, C. PETER CARLUCCI, JR., JOHN E. DENTON, BRIAN J. DRISCOLL, LAWRENCE V. JACKSON, JAMES W. JOHNSTON, DAVID C. MORAN, DAN C. SWANDER, ISAIAH TIDWELL, AND PATRICIA A. WAREHIME,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff David Shaev Profit Sharing Account ("Plaintiff"), on behalf of itself and all others similarly situated, by and through its attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of itself and the other ordinary shareholders of Snyder's-Lance, Inc. ("Snyder's-Lance" or the "Company"), except Defendants (defined below) and their affiliates, against Snyder's-Lance and the members Snyder's-Lance's board of directors (the "Board" or the "Individual Defendants") for their violations of Section

14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.Proxy-9, in connection with the proposed merger between Snyder's-Lance and Campbell Soup Company ("Campbell") through a merger transaction as alleged in detail herein ("Proposed Transaction").

2.      On December 18, 2017, Snyder's-Lance and Campbell issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Snyder's-Lance, Campbell, and Twist Merger Sub, Inc., a wholly-owned subsidiary of Campbell ("Merger Sub").   Pursuant to the Merger Agreement, Campbell will acquire Snyder's-Lance through the merger of Merger Sub with and into Snyder's-Lance, with Snyder's-Lance surviving the merger and becoming a wholly owned subsidiary of Campbell.

3.      Pursuant to the terms of the Merger Agreement, Snyder's-Lance stockholders will receive $50.00 per share in cash in exchange for each share of Snyder's-Lance common stock that they own (the "Merger Consideration").

4.      The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Snyder's-Lance's public stockholders.   In fact, the financial analyses conducted by Goldman Sachs & Co. LLC ("Goldman Sachs"), the Company's financial advisor, illustrates that the value of the Company's shares exceeds the Merger Consideration.   For example, Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses – EPS* indicates a per share value range as high as ***$59.20***, which illustrates that each share of Snyder's-Lance common stock has an inherent premium of ***approximately 18%*** over the $50.00 Merger Consideration.

5.      On January 17, 2018, in order to convince Snyder's-Lance's stockholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement on a Schedule 14A (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses conducted by the Goldman Sachs.

7.      The special meeting of Snyder's-Lance stockholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Snyder's-Lance's stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Snyder's-Lance maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff is, and has been at all relevant times, the owner of Snyder's-Lance common stock and has held such stock since prior to the wrongs complained of herein.

13.     Defendant Snyder's-Lance is a North Carolina corporation with its principle executive offices located at 13024 Ballantyne Corporate Place, Suite 900, Charlotte, North Carolina 28277.   Snyder's-Lance manufactures, markets, and distributes snack foods.   The Company offers sandwich crackers, cookies, restaurant crackers and bread basket items, candy, chips, meat snacks, nuts, and cake items.   Snyder's-Lance serves customers in the State of North Carolina.   Snyder's-Lance's common stock trades on the NASDAQ under the symbol "LNCE".

4

14.     Defendant Jeffrey A. Atkins is, and has been since 2010, a director of the Company.

15.     Defendant Peter P. Brubaker is, and has been since 2010, a director of the Company.

16.     Defendant C. Peter Carlucci, Jr., is, and has been since 2010, a director of the Company.

17.     Defendant John E. Denton is, and has been since 2010, a director of the Company.

18.     Defendant Brian J. Driscoll is, and has been since 2016, a director of the Company and has served as the Company's President and Chief Executive Officer since April 2017.

19.     Defendant Lawrence V. Jackson is, and has been since 2015, a director of the Company.

20.     Defendant James W. Johnston is, and has been since 2016, a director of the Company and has served as Chairman of the Board since 2016.

21.     Defendant David C. Moran is, and has been since 2015, a director of the Company.

22.     Defendant Dan C. Swander is, and has been since 2010, a director of the Company.

23.     Defendant Isiah Tidwell is, and has been since 2010, a director of the Company.

24.     Defendant Patricia A. Warehime is and has been since 2010, a director of the Company.

25.     The defendants identified in paragraphs 14 through 24 are collectively referred to herein as the "Individual Defendants" and/or the "Board," collectively with Snyder's-Lance the "Defendants."

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Snyder's-Lance common stock who are being and will be harmed by Defendants' actions described below (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

27.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all its members is impracticable. According to the Proxy, as of January 10, 2018, there were 102,148,731 shares of Snyder's-Lance common stock outstanding.

(b)     the holders of these shares are believed to be geographically dispersed through the United States; and

(c)     there are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

i.      whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

6

iii.    whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Merger as presently anticipated.

(d)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(e)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(f)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(g)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background and the Proposed Transaction

28.    Snyder's-Lance, incorporated on December 14, 1926, is a snack food company. The Company is engaged in the manufacturing, distribution, marketing and sale of snack food products.  Snyder's-Lance's products include pretzels, sandwich crackers, kettle cooked chips, pretzel crackers, cookies, potato chips, tortilla chips, restaurant style crackers, popcorn, nuts, and other salty snacks.  Its products are packaged in various single-serve, multi-pack, family-size, and party-size configurations.  The Company's branded products are principally sold under

7

various names owned by the Company. Snyder's-Lance has operations in North America and Europe.

29. On December 18, 2017, Snyder's-Lance and Campbell issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

### CAMPBELL TO ACQUIRE SNYDER'S-LANCE, INC. TO EXPAND IN FASTER-GROWING SNACKING CATEGORY

- Campbell to acquire Snyder's-Lance for $50.00 per share in an all-cash transaction
- Combination of Campbell's baked snacks portfolio and Snyder's-Lance's complementary portfolio creates a snacking platform with approximately $4.7 billion net sales on a pro forma basis
- Campbell's annual net sales expected to exceed $10 billion
- Expects approximately $170 million in cost synergies by end of fiscal 2022; additionally, expects to achieve a majority of Snyder's-Lance's existing cost transformation program
- Acquisition expected to be accretive to Campbell's Earnings Per Share (EPS) in fiscal 2019
- Investor conference call today at 10:30 a.m. EST

**CAMDEN, N.J. and CHARLOTTE, N.C., Dec. 18, 2017—Campbell Soup Company (NYSE: CPB)** and **Snyder's-Lance (NASDAQ: LNCE)** today announced that the companies have entered into an agreement for Campbell to acquire Snyder's-Lance for $50.00 per share in an all-cash transaction. The purchase price represents a premium of approximately 27 percent to Snyder's-Lance's closing stock price on Dec. 13, 2017, the last trading day prior to media reports regarding a potential transaction. The acquisition, which has been approved by the Boards of Directors of both companies, will enable Campbell to expand its portfolio of leading snacking brands.

Snyder's-Lance is a leading snacking company that manufactures and markets snack food throughout the United States. The company's portfolio includes well-known brands such as *Snyder's of Hanover*, *Lance*, *Kettle Brand*, *KETTLE* chips, *Cape Cod*, *Snack Factory Pretzel Crisps*, *Pop Secret*, *Emerald* and *Late July*. Snyder's-Lance has leading market positions in its core categories including pretzels, sandwich crackers, kettle chips, deli snacks and organic and natural tortilla chips.

**Acquisition and Snyder's-Lance Highlights:**

- Combines the strengths of both organizations to drive sales growth and expand Campbell's footprint in the $89 billion U.S. snacking market, which had a three-year compound annual growth rate (CAGR) of nearly 3 percent
- Snyder's-Lance reported $2.2 billion in net sales for the trailing 12 months ended Sept. 30, 2017
- From calendar 2012-2016, Snyder's-Lance net sales grew at an 11.5 percent CAGR; organic net sales outpaced category growth with a 4 percent CAGR

The acquisition of Snyder's-Lance will accelerate Campbell's access to faster-growing distribution channels including the convenience and natural channels.

**Strengthening Campbell's Portfolio in Faster-Growing Categories**

Denise Morrison, Campbell's President and Chief Executive Officer, said, "The acquisition of Snyder's-Lance will accelerate Campbell's strategy and is in line with our Purpose, 'real food that matters for life's moments.' It will provide our consumers with an even greater variety of better-for-you snacks. The combination of Snyder's-Lance brands with Pepperidge Farm, Arnott's and Kelsen will create a diversified snacking leader, drive sales growth and create value for shareholders. This acquisition will dramatically transform Campbell, shifting our center of gravity and further diversifying our portfolio into the faster-growing snacking category. We look forward to welcoming Snyder's-Lance's employees and their trusted family of leading brands to our company."

Campbell's baked snacks product portfolio generated approximately $2.5 billion in net sales in fiscal 2017. With the addition of Snyder's-Lance's complementary portfolio, snacking would represent approximately 46 percent of Campbell's annual net sales (previously 31 percent) on a pro forma basis. Campbell's soup portfolio, including the recent acquisition of Pacific Foods, would represent approximately 27 percent of the company's annual net sales.

Brian J. Driscoll, President and Chief Executive Officer of Snyder's-Lance, said, "Following a thorough review process of strategic options, we believe this transaction maximizes value for our shareholders through an immediate and certain cash premium.

9

The transaction also unlocks the value of our portfolio, reflecting the progress we have made planning and executing our transformation. We are excited to join Campbell and to continue to provide great products to our consumers with an uncompromising focus on ingredients, quality and taste."

**Creating a Snacking Leader**

Snyder's-Lance will become part of Campbell's Global Biscuits and Snacks division, which includes the company's Pepperidge Farm, Arnott's and Kelsen businesses, and the simple meals and shelf-stable beverages business in Australia, Asia Pacific and Latin America. The division is led by Luca Mignini, President. The division will combine Snyder's-Lance's portfolio with Campbell's iconic snacking brands including Goldfish crackers, Tim Tam biscuits, Milano cookies and Kjeldsens butter cookies.

Mignini said, "Campbell's expertise in brand-building, R&D, and supply chain and operations, coupled with Snyder's-Lance's well-known portfolio, distribution system and history of strong sales growth, will allow us to create a differentiated, branded snacking business with greater scale. The combined portfolio will be even more relevant to consumers who are increasingly seeking better-for-you snacks."

Headquartered in Charlotte, N.C., Snyder's-Lance has approximately 6,000 employees and operates 13 manufacturing centers throughout the United States and United Kingdom.

**Approvals and Financing**

Campbell plans to finance the acquisition through $6.2 billion of debt comprising a combination of long-term and short-term debt. Pro forma leverage is expected to be 4.8x at closing, and the company is committed to deleveraging to approximately 3x by fiscal 2022. Campbell will suspend share repurchases to maximize free cash flow for the purposes of paying down debt. Campbell also expects to maintain its current dividend policy.

The closing of the transaction is subject to the approval of Snyder's-Lance shareholders, as well as customary regulatory approvals and other closing conditions. Certain members of the Warehime family, who collectively own 13.2 percent of Snyder's-Lance's outstanding common stock, have agreed to vote their shares in support of the transaction. Closing is expected by early second quarter of calendar 2018. Campbell expects the acquisition

to be accretive to adjusted EPS in fiscal 2019, excluding integration costs and costs to achieve synergies.

Credit Suisse acted as lead financial adviser to Campbell in this transaction. Rothschild also acted as a financial adviser to Campbell. Weil, Gotshal & Manges LLP acted as Campbell's legal counsel. Goldman Sachs & Co. LLC acted as lead financial adviser to Snyder's-Lance. Deutsche Bank has also acted as long-time financial adviser to Snyder's-Lance. Jenner & Block LLP acted as legal counsel to Snyder's-Lance.

### Reshaping Campbell's Portfolio

This is Campbell's sixth acquisition in five years. The company acquired Bolthouse Farms in August 2012, organic baby food company Plum in June 2013, biscuit company Kelsen in August 2013, fresh salsa and hummus maker Garden Fresh Gourmet in June 2015, and organic broth and soup producer Pacific Foods in December 2017.

[***][1]

30.     The Merger Consideration in the Proposed Transaction is unfair and inadequate, because, among other things, the intrinsic value of the Company and its common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.  As a result, the Proposed Transaction will deny Class members their right to fully share equitably in the true value of the Company.

31.     For example, *The Motley Fool* noted that between 2012 and 2016, Snyder's-Lance had a compounded annual growth rate (CAGR) of 11.5% in revenue and "averaged

---

[1]     Snyder's-Lance, Inc., Current Report (Form 8-K), at Exhibit 99.2 (Joint Press Release, dated December 18, 2017, issued by Snyder's-Lance, Inc. and Campbell Soup Company) (Dec. 18, 2017).

organic net growth (that is, core growth after revenue from acquisitions and currency effects are removed) of 4% -- pretty fast expansion for a consumer packaged goods (CPG) company."[2]

32.    On August 8, 2017, the Company announced its second quarter 2017 financial results and updated its full-year 2017 outlook.  Notably, total net revenue from continuing operations in the second quarter of 2017 increased 3.3% compared to the second quarter of 2016 and revenue from core brands rose 4.7% to $420.5 million.

33.    Furthermore, Snyder's-Lance's stock jumped *11.65%* in response to the positive news.[3]

34.    On December 15, 2017—just days before the Proposed Transaction was announced—CapitalCube, an online publication that provides financial research and content for investors, information providers, finance portals and media, discussed in-depth how the Company is undervalued and has upside potential.[4]  CapitalCube highlighted that Snyder's-Lance has outperformed its peers during the last year and last month and, as a result, the market expects faster growth from the Company than its peers.  In addition, the Company's "share price performance of *16.40%* over the last 12 months is above peer median of 3.58%.  The 30-day trend in its share price performance of *24.88%* is also above the peer median of 3.71% suggesting that this company is a leading performer relative to its peers."  *Id.*  Moreover, Snyder's-Lance's stock was trading at $46.79 at the time the article was published.

---

[2]    *Campbell Soup's Risky Bet on Salty Snacks*, The Motley Fool (Dec. 20, 2017), *available at*    https://www.fool.com/investing/2017/12/20/campbell-soup-makes-a-risky-bet-on-salty-snacks.aspx.

[3]    *Snyder's-Lane +12% after revenue grows*, Seeking Alpha (Aug. 8, 2017), *available at* https://seekingalpha.com/news/3286914-snyders-lance-plus-12-percent-revenue-grows.

[4]    *Snyder's-Lance, Inc.: Strong price momentum but will it sustain?*, CapitalCube (Dec. 15, 2017), *available at* http://www.capitalcube.com/blog/index.php/snyders-lance-inc-strong-price-momentum-but-will-it-sustain-2/.

35.     In sum, the Merger Consideration appears to inadequately compensate Snyder's-Lance stockholders because, among other things, the intrinsic value of the Company's common stock is materially in excess of the Merger Consideration.  Given the Company's growth potential and assets, it appears that the $50.00 per share Merger Consideration is not fair compensation for Snyder's-Lance stockholders.  Clearly, the Merger Consideration denies Class members their right to fully share equitably in the true value of the Company.

36.     It is therefore imperative that Snyder's-Lance public common stockholders receive the material information (discussed in detail below) that has been omitted from the Proxy, which is necessary for the Company's stockholders to properly exercise their corporate suffrage rights and make a fully informed decision concerning whether to vote their shares in favor of the Proposed Transaction.

**B.     The Merger Agreement's Preclusive Deal Protection Devices**

37.     To the detriment of Snyder's-Lance stockholders, the Board agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

38.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Snyder's-Lance stockholders.  Specifically, the Merger Agreement generally states that the Company and the Individual Defendants shall not: (i) solicit, initiate, or knowingly facilitate or knowingly encourage any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any

other person any information in connection with or for the purpose of soliciting, knowingly encouraging or facilitating, an acquisition proposal or any proposal or offer that could reasonably be expected to lead to an acquisition proposal.[5]

39.     Furthermore, the Company and the Individual Defendants must notify within 24 hours, orally or in writing, any inquiries, proposals, or offers with respect to, or that could reasonably be expected to lead to, an acquisition proposal.  *See id.* at 43.

40.     Additionally, the Merger Agreement grants Campbell recurring and unlimited matching rights, which provides it with four (4) business days, and two (2) business days in advance if such notification relates to a superior proposal, to negotiate with Snyder's-Lance, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.  *See id.* at 44.

41.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Campbell can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Campbell, to the detriment of Snyder's-Lance public common stockholders.

42.     The Merger Agreement also provides that Snyder's-Lance must pay Campbell a termination fee of $149,000,000 under certain conditions, including in the event Snyder's-Lance elects to terminate the Merger Agreement to pursue a superior proposal.  *See id.* at 65.  The termination fee provision further ensures that no competing offer will emerge, as any competing

---

[5] Snyder's-Lance, Inc., Current Report (Form 8-K), at Exhibit 2.1 at 41 (Agreement and Plan of Merger among Snyder's-Lance, Inc., Campbell Soup Company and Trust Merger Sub, Inc. dated as of December 18, 2017) (Dec. 18, 2017).

bidder would have to pay a naked premium for the right to provide Snyder's-Lance stockholders with a superior offer.

43.     Ultimately, these preclusive deal protection provisions restrain Snyder's-Lance's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

44.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Snyder's-Lance's public common stockholders receive all material information necessary for them to make a fully informed decision concerning whether to vote their shares in favor of the Proposed Transaction.

**C.     The Proxy Statement Is Materially Incomplete and Misleading**

45.     On January 17, 2018 filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Financial Projections Prepared by Snyder's-Lance's Management*

46.     First, the Proxy fails to disclose Snyder's-Lance's unlevered free cash flow projections[6] for 2017 through 2020.  *See* Proxy at 42-43.  The Company's unlevered free cash

---

[6]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and

flows are material to the Company's stockholders. Indeed, Goldman Sachs specifically utilized unlevered free cash flows in their discounted cash flow valuation. Moreover, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's stockholders need to assess in determining whether to vote in favor of the merger is clear: is the Merger Consideration fair compensation given the Snyder's-Lance's expected unlevered free cash flows? Without unlevered free cash flow projections, the Company's stockholders will not be able to answer this question and assess the fairness of the Merger Consideration.

47.     Furthermore, EBITDA is not a sufficient alternative to unlevered free cash flows – as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[7] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[8] As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company. Simply

---

allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

[7]     Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[8]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

put, the unlevered free cash flow projections are material and their omission renders the projections included in the Proxy misleading.

48.     Second, although the Proxy provides several non-GAAP financial metrics, such as EBITDA, for Snyder's-Lance, it fails to provide the line item projections detailed below for the metrics used to calculate these non-GAAP measures, including: (i) interest expense; (ii) income taxes; (iii) depreciation and amortization.

49.     Failure to provide complete and full disclosure of the line item projections for the metrics used to calculate the above-mentioned non-GAAP metrics leaves Snyder's-Lance's stockholders without the necessary and material information to reach a full-informed decision concerning the Company, the fairness of the Merger Consideration, and, ultimately, whether to vote in favor of the Proposed Transaction.

50.     Furthermore, Snyder's-Lance's has previously provided its shareholders with the above-mentioned information, and the disclosure of such information has illustrated that there is a substantial difference between the GAAP and non-GAAP financial metrics.  For example, the chart below is from Snyder's-Lance's third quarter 2017 press release:

17

| (in thousands) | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2017 | | October 1, 2016 | |
| (Loss)/income from continuing operations | $ | (57,718) | $ | 25,546 |
| Income tax (benefit)/expense | | (6,043) | | 10,663 |
| Interest expense, net | | 10,141 | | 9,215 |
| Depreciation | | 17,489 | | 18,494 |
| Amortization | | 6,832 | | 5,448 |
| **EBITDA from continuing operations** | $ | (29,299) | $ | 69,366 |
| *As a % of net revenue* | | *(5.2)%* | | *12.8%* |
| | | | | |
| Transaction and integration related expenses[1][2] | | 276 | | 4,098 |
| Emerald move and required packaging changes[3] | | 2,478 | | 314 |
| Transformation initiative[4] | | 7,019 | | — |
| Other impairment charges[5] | | 104,720 | | — |
| Other[6] | | (19) | | 918 |
| **Adjusted EBITDA from continuing operations** | $ | 85,175 | $ | 74,696 |
| *As a % of net revenue* | | *15.1%* | | *13.7%* |

(1) For the third quarter of 2017, transaction and integration related expenses primarily consist of idle facility lease costs.
(2) For the third quarter of 2016, transaction and integration related expenses primarily consist of professional fees, severance, and retention costs associated with the acquisition of Diamond Foods.
(3) Expenses associated with the relocation of Emerald production from Stockton, CA to Charlotte, NC.
(4) Transformation initiative costs primarily consist of expenses associated with the closure of our Perry, FL manufacturing facility, as well as severance benefits and professional fees related to our performance transformation plan.
(5) Impairment charges recorded for certain trademarks and our European reporting unit goodwill.
(6) For the third quarter of 2016, other items primarily consist of Metcalfe's transaction-related expenses including transaction costs and severance benefits, as well as an inventory step-up related to that acquisition.

51.     The omission of the above-referenced projections renders the financial projections included on pages 42 through 44 of the Proxy materially incomplete and misleading.  If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.   With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

52.     Furthermore, complete disclosure of the above-mentioned information omitted from the financial projections is particularly important for Snyder's-Lance stockholders in light

of the fact that the Snyder's-Lance stockholders are being asked to vote for the Proposed Transaction, which has been unanimously endorsed by the Board, that, if consummated, will cause Snyder's-Lance stockholders to be cashed out of the Company and deny them their right to fully share equitably in the true value of the Company.

### *Goldman Sachs' Valuation Analyses and Fairness Opinion*

53.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the range of illustrative enterprise values for the Company as of September 30, 2017; (ii) the Company's estimated unlevered free cash flows for the period from October 1, 2017 to December 31, 2020; (iii) the range of illustrative terminal values for the Company as of December 31, 2020; (iv) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 1.75% to 2.25%; (v) the inputs and assumptions underlying the calculation of EBITDA, including interest expense, income taxes, and depreciation and amortization; (vi) the value of the Company's net working capital; (vii) the value of the Company's capital expenditures; (viii) the value of the Company's net debt as of September 30, 2017; (ix) the value of the Company's cash payment obligations in respect to its performance share units less cash and minority interests as of September 30, 2017; (x) the range of the Company's illustrative equity values; and (xi) the Company's net operating losses.  *See* Proxy at 48.

54.     Likewise, with respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses – EBITDA*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the NTM EBITDA multiples range of 12.0x to 13.1x; (ii) the value of the Company's estimated net debt as of December 31, 2019; (iii) the inputs and assumptions underlying the calculation of the discount

rate of 7.2%; (iv) the range of theoretical future values per share of Company stock; and (v) the range of the estimated cumulative dividends per share.

55.     Similarly, with respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses – EPS*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the NTM EPS multiples range of 20.1x to 25.6x; (ii) the inputs and assumptions underlying the calculation of the discount rate of 7.2%; (iv) the range of theoretical future values per share of Company stock; and (v) the range of the estimated cumulative dividends per share.

56.     These key inputs are material to Snyder's-Lance's stockholders, and their omission renders the summary of Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* and both *Illustrative Present Value of Future Share Price Analyses* materially incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….  This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight**

> ***assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

57.     With respect to Goldman Sachs' *Historical Trading Multiples Analysis*, the Proxy fails to disclose the individual multiples Goldman Sachs calculated for each company utilized. The omission of these multiples renders the summary of the analysis and the average enterprise value and average price multiples misleading. A fair summary of *Historical Trading Multiples Analysis* requires the disclosure of the individual multiples for each company; merely providing the median and average values that a banker applied is insufficient, as Snyder's-Lance's stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the Company's value.

58.     Finally, with respect to Goldman Sachs' *Implied Premia and Multiple Analyses*, the Proxy fails to disclose the following key components used in their analysis: (i) the inputs and assumptions underlying the calculation of the Company's net debt as of September 30, 2017; and (ii) the book value of the Company's equity investments as of September 30, 2017. For the reasons stated above, the failure to disclose such information renders the *Implied Premia and Multiple Analyses* materially incomplete and misleading.

59.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make

a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14-9.

62.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy and the use of their name in the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses conducted by the Goldman Sachs.

63.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to Snyder's-Lance's stockholders although they could have done so without extraordinary effort.

64.     Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most, if not all, of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction, or should have reviewed and relied on such information. Indeed, the Proxy states that Defendants were privy to and had knowledge of the financial projections for both companies and the details surrounding discussions with other interested parties and Goldman Sachs. Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Goldman Sachs' analyses in connection with their receipt of the fairness opinions, question Goldman Sachs' as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

65.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement, the preparation and review of strategic alternatives, and the review of both companies' financial projections.

66.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, deprive them of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the stockholder vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of Snyder's-Lance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Snyder's-Lance, and participation in and/or awareness of the Snyder's-Lance operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Snyder's-Lance, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Snyder's-Lance, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy contains the unanimous recommendation of the Board to approve the Proposed Transaction. The Individual Defendants were thus directly involved in the making of the Proxy.

71.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

74.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

C.      Rescinding, to the extent already implemented, the Merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

**WHITFIELD BRYSON & MASON LLP**

/s/ *Daniel K. Bryson*
Daniel K. Bryson
N.C. Bar No. 15781
Patrick M. Wallace
N.C. Bar. No. 48138
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
Dan@wbmllp.com
Pat@wbmllp.com


*Local Civil Rule 83.1 Counsel for Movant and Proposed Local Counsel*

**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole*
Benjamin Kaufman*
Gloria Kui Melwani*
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
gmn@whafh.com
Kaufman@whafh.com
Melwani@whafh.com

MONTEVERDE & ASSOCIATES PC
Juan E. Monteverde *
Miles D. Schreiner*
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*\* pro hac vice application forthcoming*